NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0001n.06

Nos. 24-3885/3886

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 02, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| DAVID JOHNSON, | ) ) | |
|     Defendant-Appellant. | ) ) ) | OPINION |

Before: CLAY, KETHLEDGE, and LARSEN, Circuit Judges.

**CLAY, Circuit Judge.** Defendant David Johnson was sentenced to 446 months in prison after he was found guilty of four counts of robbery affecting commerce, four counts of using, carrying, and brandishing a firearm during and in relation to a crime of violence, and one count of felon in possession of a firearm, in violation of 18 U.S.C. § 1951, 18 U.S.C. § 924(c), and 18 U.S.C. §§ 922(g)(1) and 924(a)(2) respectively. Defendant was also sentenced to 24 months' imprisonment for violating of the terms of his supervised release and a cumulative 24 months' imprisonment for various summary criminal contempt findings by the district court. Defendant now appeals the admission of the government expert's PowerPoint presentation summarizing telephone record and Google account geolocation data at his second trial, the district court's summary criminal contempt findings against him, and the constitutionality of § 924(c)(1)(D)(ii)'s mandate that the district court run his § 924(c) convictions consecutive to his separate state sentence.

For the reasons set forth below, we **AFFIRM** the judgment of the district court and the October 2, 2024 criminal contempt order and **DISMISS** Defendant's appeal of the district court's August 29, 2022 and April 11, 2023 criminal contempt orders.

## I.    BACKGROUND

### A.  Factual Background

Four different Ohio gas stations or small businesses were robbed between late 2019 and early 2020.  The first robbery occurred on November 27, 2019, when an individual entered a Sunoco gas station in Euclid, Ohio and pointed a stainless semi-automatic pistol at the clerk.  The individual demanded money from the clerk and, after receiving money from the clerk, quickly fled the scene on foot.

The next robbery occurred on January 18, 2020 at a BP gas station in Parkman, Ohio.  An employee was taking out the garbage when an individual grabbed the employee by his hoodie and dragged him into the gas station while pointing a firearm at him.  The individual ordered the employee, a customer, and another employee behind the counter of the gas station and demanded money from the cash register while still pointing the firearm at them.  Once the individual received the money, he ordered the three to lie on the ground, shoved the customer to the ground, and departed the gas station.

That same day, a third robbery occurred at a Dollar General store in Chardon Township, Ohio.  An individual wore a mask and gloves, and brandished a silver-colored handgun at a clerk. The individual directed the clerk to the cash register and safe to take money from them.  Then, the individual left the scene.

Finally, a fourth robbery occurred on January 25, 2020 at a Gas Mart in Euclid, Ohio. individual entered through the front door, pointed a firearm at two employees, and demanded

money from them. The individual grabbed one of the employees by the back of his shirt and forced him at gunpoint to the store's cash register. After forcing the employee to hand over the money in the register, the individual also forced the employee to give him the money in the store's safe. Thereafter, the individual fled the store.

Following a cross federal and state agency investigation, Defendant David Johnson was identified as the suspected robber of all four armed robberies. Federal law enforcement was familiar with Defendant because he was on supervised release for a separate conviction in the Northern District of Ohio. Local law enforcement eventually found and arrested Defendant at his residence. During the arrest, officers seized two cell phones. After searching his residence, officers found several articles of clothing and a firearm that matched those identified in the surveillance camera footage that captured the robberies. Law enforcement officers also searched Defendant's public Instagram account. From this social media review, officers determined Defendant matched the physical description of the suspects in each robbery, as determined from witness testimony and surveillance camera footage. The officers also found Instagram posts of Defendant wearing clothing that matched that worn by the suspects.

Federal law enforcement officers also obtained search warrants for Defendant's associated Google account. The Global Positioning System information of Defendant's phone, which was logged into that Google account, tied his phone to approximately the time and place of the robberies.

**B. Procedural History**

On October 22, 2020, a federal grand jury returned an indictment against Defendant. The indictment charged Defendant with four counts of robbery affecting commerce, four counts of using, carrying, and brandishing a firearm during and in relation to a crime of violence, and one

count of felon in possession of a firearm, in violation of 18 U.S.C. § 1951, 18 U.S.C. § 924(c), and 18 U.S.C. §§ 922(g)(1) and 924(a)(2) respectively.

Defendant maintained his innocence and elected to proceed to trial. His trial date, however, was beset with delay. The district court faced a backlog of scheduled trials following the end of COVID-19 related restrictions on in-person activities. Consequently, the court estimated a trial date "sometime in 2022." May 11, 2021 Pretrial Conference Tr., R. 160, PageID #3041.

Defendant also faced separate state charges for unrelated robberies. On September 9, 2021, the district court subsequently postponed the setting of Defendant's trial date until the resolution of Defendant's state trial. The district court also noted that "[Defendant's] trial isn't going to happen for a long time" due to the complexities of Defendant's case and the glut of trials the court had scheduled for the remainder of 2021. Sept. 9, 2021 Pretrial Conference Tr., R. 130, PageID #2714. As a result, the district court offered to reassign Defendant's case to a different judge to speed up his trial date. Defendant declined these offers. Defendant's state trial did not resolve until December 6, 2021, when he received a 47 year sentence for his unrelated state robbery charges.

### 1. Defendant's Behavior at Pretrial Proceedings

The district court held a virtual pretrial conference on May 5, 2022 to set Defendant's trial date. The conference did not go smoothly. Defendant, apparently incredulous at the court's delay in setting his trial date and the prospect of serving time in addition to his 47 year state sentence, repeatedly and rudely interrupted the district court judge as the judge attempted to discuss Defendant's state sentence with the government. The district court admonished Defendant for his outbursts and threatened to add "six months for contempt" if Defendant "mouth[ed] off again and interrupt[ed]" the court. May 5, 2022 Pretrial Conference Tr., R. 29, PageID #203. That warning

was effective for about a minute and thirty seconds, after which Defendant again interrupted the

district court to complain about a partially conveyed plea agreement and his due process rights.  A

tit-for-tat exchange between the district court and Defendant followed:

> THE COURT:  Mr. Johnson, any more -- any more outbursts from you, it's six months' contempt.  I don't –
>
> THE DEFENDANT:  You can give me 160, I don't care.
>
> THE COURT: Okay.  You got six months, okay?
>
> THE DEFENDANT:  All right.
>
> THE COURT:  You've got six months, it's tacked on.
>
> THE DEFENDANT:  Okay, sir.  For me asking about what my lawyer supposed to do, I got six months? All right.  Add another six months.
>
> THE COURT:  Okay. You got it, that's twelve.
>
> THE DEFENDANT:  Or add another six months, 18 months.
>
> THE COURT:  Okay.  You got it, 18 months.
>
> THE DEFENDANT:  What's next?
>
> THE COURT:  It's up to you what's next. You've got another 18.
>
> THE DEFENDANT:  Is that how the Government go?  You just giving me six months asking about, inquiring about things.  That's you, sir.  I'm going to be okay.
>
> THE COURT:  No, you asked.  You asked.
>
> THE DEFENDANT:  I'm going to be okay, man.
>
> THE COURT:  All right.  It's 18 months. Okay.  Now, what -- what was the plea offer, Ms. Kane?  We'll put it on the record now.

*Id.* at PageID #204–05.

After the government's attorney elaborated on the status of plea negotiations between the government and Defendant, Defendant again interrupted the district court:

> THE DEFENDANT:  I know it already.  We did this already.  We did all this already, Polster.  I'm out here for nothing.  Just set the date for the trial and get me on back to my cell.
>
> THE COURT:  All right.  That's another – that's another six months.
>
> THE DEFENDANT:  Thirty-eight years.  Man, I'm facing 38 years.  We did this already, man.
>
> THE COURT:  That's another six months.
>
> THE DEFENDANT:  Just set the date and get me back.  That's it.
>
> THE COURT:  You just got another six months, sir.
>
> THE DEFENDANT:  Why we going back and forth, man?
>
> THE COURT:  Sir, if you keep going we won't need a trial.
>
> THE DEFENDANT:  Just set a date and let me go on about my business.
>
> THE COURT:  If you keep going, we won't need a trial.  Okay?  So you've got another six months for mouthing off.  I wasn't speaking to you.
>
> THE DEFENDANT:  I'm going to get a trial regardless.  I got to have my day in court, man.

*Id.* at PageID #206–207.

After discussing with the government attorney about the mandatory minimum sentence Defendant faced, the district court attempted to convey to Defendant how a plea agreement could result in some charges being dropped and some part of his sentence running concurrent to his state conviction.  This discussion, however, led to a third squall between the district court and Defendant:

THE COURT: Mr. Johnson, you already have two years of contempt. You want to keep –

THE DEFENDANT: I know but, sir, I'm serving that on your end. I'm questioning about what's going on, so you gave me two years for asking questions about what's going on in my case.

THE COURT: No, you got two years for interrupting me, for preventing me from making a record. And if you keep doing it, I'll keep adding sentences, six months.

THE DEFENDANT: Add it, more and more, sir. Do your thing, sir. Whatever makes you comfortable, so you can sleep at night, do it.

THE COURT: Mr. Schwartz, Mr. Schwartz, am I correct that if you -- if Mr. Johnson authorized you to do so, you would engage in discussions with Ms. Kane and see what specifically you could negotiate, is that right?

THE DEFENDANT: There's no specific deal, man. Why you talking about negotiating?

THE COURT: Mr. Johnson, you want another six months?

THE DEFENDANT: Add it up. Do your thing, sir.

THE COURT: All right.

THE DEFENDANT: Do your thing.

THE COURT: All right. You've got another six months, Mr. Johnson.

THE DEFENDANT: Okay. Add some more. Add some more.

THE COURT: Another six? Okay. Thirty-six. Keep going, sir. I'll keep going as long as you want.

THE DEFENDANT: Keep going.

THE COURT: All right. Forty-two. You think I'm kidding? You're messing with the wrong Judge, sir.

THE DEFENDANT: No, you're messing with the wrong power of attorney.

*Id.* at PageID #215–17.

- 7 -

By the end of the May 5, 2022 pretrial conference, Defendant racked up 7 six-month contempt sentences for a total of 42 months imprisonment. The court did not, however, memorialize the contempt sentences in a written order following this conference.

On August 29, 2022, the district court held a virtual motion hearing on defense counsel's motion to withdraw. After giving Defendant permission to speak on the matter, the court interjected to question Defendant's assertion that he was not aware of his attorney's representation of him. This led to another back-and-forth exchange between the court and Defendant wherein the court warned Defendant that he could yet again hold him in contempt. After further admonishment to Defendant from the district court and the courtroom deputy, the district court made good on its threat:

> THE COURT: Stop interrupting me. You do it again, it's six months in contempt in prison tacked on, all right?
>
> THE DEFENDANT: Already gave me –
>
> THE COURT: I warned you two times.
>
> THE DEFENDANT: I mean, I'm trying to do this all –
>
> THE COURT: Mr. Johnson, I'm not – you're not speaking any more. I am.
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Mr. Schwartz, all right, this is the problem, sir. You have known for -- the record is clear you have known at least -- at least –
>
> THE DEFENDANT: At least –
>
> THE COURT: Mr. Johnson, I wasn't speaking to you. I'm speaking to Mr. Schwartz. One more time and it's six months.
>
> COURTROOM DEPUTY: Your Honor, I can mute his audio if –
>
> THE COURT: No, don't mute him. If he interrupts, he knows it's a six-month prison sentence on top of anything else. Mr. Schwartz, you have known since at least September of 2021 maybe or –

> THE DEFENDANT:  No. I'm –
>
> THE COURT:  That's six months contempt, Mr. Johnson.  You've interrupted me for the fourth time, so that's a six-month contempt sentence.

Mot. Hr'g Tr., R. 28, PageID #182–83.

This time, the district court memorialized its finding of contempt against Defendant in a written order that was entered onto the docket.  This order only reflected the court's intent to impose a six month contempt finding on Defendant following the August 29, 2022 hearing.

On September 22, 2022, Defendant moved for a competency evaluation pursuant to 18 U.S.C. § 4241.  The district court granted the motion the next day and postponed Defendant's trial date pending the results of the evaluation.  The evaluation report was submitted to the district court at some point in February 2023, and the report found Defendant to be competent but "opposition defian[t]."  March 2, 2023 Status Conference Tr., R. 151, PageID #2821.  The court then set Defendant's trial for September 11, 2023.

The district court held a pretrial conference on April 11, 2023.  The court attempted to discuss defense counsel's most recent motion to withdraw, but the discussion resulted in two more contempt findings against Defendant:

> THE COURT:  . . . Now, it doesn't make sense for you to go to trial with a lawyer where the relationship has broken down.  The trial's not for six months.  So I'm going to permit Mr. Schwartz to withdraw and his firm to withdraw.  Now, you hired -- you never asked –
>
> THE DEFENDANT:  Hold on.  Time out.  Time out.
>
> THE COURT:  You never asked me to appoint a lawyer for you.
>
> THE DEFENDANT:  Sir, you just admitted it that the firm stay on, now you're saying you're going to do another motion off?
>
> THE COURT:  No.  I –

THE DEFENDANT:  You made a mistake last time.  You made a mistake last time.  We had one of these hearings last time, you made a mistake.  So now you –

THE COURT:  Well, I did, and I also said that if you weren't paying them –

THE DEFENDANT:  Who?

THE COURT:  If you were not paying your lawyer –

THE DEFENDANT:  He got his money, he's not working for me, and it's not the man that my fiancée went to go hire.  She'll go on the stand and say she about to be a doctor in July.  She can't wait to get on the stand and say she went to go get... (Unclear speech; clarification requested by court reporter.)

THE COURT:  Sir.

THE DEFENDANT:  I'm just tired of this.  This is frustrating.  So she going to –

THE COURT:  Frustrating for me, and you're going to – (Unreportable/indiscernible crosstalk.)

THE DEFENDANT:  She went to hire Joseph Patituce.

THE COURT:  Sir, I'm warning you.

THE DEFENDANT:  It's okay.  (Unreportable/indiscernible crosstalk.)

THE DEFENDANT:  Used to work for –

THE COURT:  I'm holding you in contempt.

THE DEFENDANT:  Yes, sir.  Do your thing.  Give me a month.

THE COURT:  All right. Six months.  Another six months, okay?  You don't seem to care.  It's another six months.

THE DEFENDANT:  Because you don't care, sir.  It's going to come through your courtroom, not -- I don't mind.  I'm going to pay all the money I need to pay after this one.  You all can't get –

THE COURT:  Do you want me to appoint a lawyer for you?

THE DEFENDANT:  I don't want appointed nothing.

April 11, 2023 Pretrial Conference Tr., R. 46, PageID #351–54.

The district court continued to ask Defendant whether he wanted the court to appoint him a lawyer or whether he intended to hire a different lawyer. Defendant refused to answer the court. The district court ordered Defendant to answer his question and threatened to hold him in contempt yet again if he refused. Defendant stayed silent, so the court found him in contempt yet again and appointed Defendant an attorney.

Following the April 11, 2023 pretrial conference, the district court again memorialized its findings of contempt against Defendant in a written order that was entered into the docket. The order explained that it initially imposed a six month contempt penalty against Defendant due to his "disruptive behavior in the courtroom." Contempt of Court Order, R. 39, PageID # 319. Then it issued another six month contempt penalty against Defendant because the court "ordered the defendant to advise the Court on whether or not he plans to retain counsel or proceed *pro se*" and "[t]he defendant refused to answer the Court's question[.]" *Id.* In total, the written order reflected a cumulative 12 month contempt sentence for Defendant's behavior at the April 11, 2023 pretrial conference.

### 2. Defendant's First Trial Results in a Mistrial

Defendant's case proceeded to trial on September 11, 2023. At trial, the government introduced the expert witness testimony of FBI Special Agent Jacob Kunkle. Agent Kunkle testified as to his analysis of Defendant's telephone record and Google location data and resulting implications with respect to Defendant's location at the time of the robberies. As a visual guide, Agent Kunkle referred to a PowerPoint presentation he prepared while he answered questions about his analysis on direct examination. The government attempted to admit the presentation as evidence, but the district court refused based on its "general policy . . . to [not] admit expert's reports." Trial Tr., R. 73, PageID #1094.

During deliberations, the jury requested that Agent Kunkle's PowerPoint presentation be provided to them. The district court told the jury that the presentation was not admitted as evidence, thus the jury was instructed to rely on their recollection of Agent Kunkle's testimony. The jury ultimately could not reach a verdict, and the district court subsequently declared a mistrial. Consequently, the district court set a new trial date for January 29, 2024.

### 3.  Defendant's Convictions at His Second Trial

Prior to Defendant's second trial, the government moved to admit certain portions of Agent Kunkle's PowerPoint presentation as evidence under Federal Rule of Evidence 1006. The government averred that the presentation summarized "voluminous cell tower and Google/Gmail location data," which contained "technical information not readily understandable to the lay reader." Mot. in Limine, R. 94, PageID #1375–77. Defendant opposed the government's request, arguing that the presentation was not a summary of raw data but "an expert's interpretation of the data." Defendant's Reply ISO Response in Opposition to Government Mot. in Limine, R. 97, PageID #1423–25. The district court agreed with the government and conditionally admitted the excerpted presentation as a secondary-evidence summary.

Defendant proceeded to his second trial on January 29, 2024. At trial, Agent Kunkle again testified as to his analysis of Defendant's telephone and Google account location data and what that implied about Defendant's approximate locations during the robberies. Agent Kunkle used his PowerPoint presentation as a visual guide during his testimony. The district court formally admitted slides 9 through 20 of Agent Kunkle's PowerPoint presentation, over Defendant's objections and with certain redactions, as a summary exhibit under Rule 1006. The court also admitted the underlying records and then gave a jury instruction regarding the PowerPoint presentation. The jury ultimately convicted Defendant on all nine counts.

### 4. Defendant's Behavior at Sentencing

Following trial, the United States probation department prepared a presentence report ("PSR"). It calculated Defendant's total offense level for Counts 1, 3, 5, 7, and 9 at 26. It also found that each of Defendant's four 18 U.S.C. § 924(c)(1)(A) counts had a statutory term of seven years to run consecutive to each other and any sentence on the other counts. Thus, with a criminal history category of V, Defendant's proposed Guidelines range was 110 to 137 months for Counts 1, 3, 5, 7, and 9 plus 336 months for counts 2, 4, 6, and 8.

The district court sentenced Defendant on October 1, 2024. It initially calculated Defendant's Guidelines range in accordance with the PSR. But the court also noted that Defendant was on supervised release at the time of the offenses and his subsequent convictions were likely violations of that supervised release. After hearing argument on the 8 U.S.C. § 3553(a) factors, the district court sentenced Defendant to a within Guidelines range sentence of 110 months for Counts 1, 3, 5, 7, and 9, the statutory minimum of 336 months for Counts 2, 4, 6, 8, and an additional 24 months for violating the terms of his supervised release to run concurrent with his state sentence. The court ran Defendant's § 924(c) sentences consecutive to each other and to Defendant's state court sentence.

During the sentencing hearing, Defendant repeatedly interrupted and interjected while the court was speaking to Defendant's attorney. After the first interruption, the court warned Defendant that any further interruptions or outbursts would result in a six-month contempt sentence. This admonishment was initially effective, but Defendant eventually interrupted the government's attorney while she was speaking to the court about Defendant's sentence for his Hobbs Act robberies. The district court levied a six-month contempt sentence following Defendant's interruption.

Defendant's next outbursts occurred while the district court was speaking to Defendant's attorney about the plea deals that were offered to him and how they related to arguments on running his sentence concurrently or consecutively to his state sentence:

> THE COURT:  Ms. Serrat, I'm going to have to correct you here. The record reflects that on numerous occasions Mr. Johnson was offered a plea agreement, a plea deal by the government –
>
> THE DEFENDANT:  For what?
>
> THE COURT:  -- in which his federal sentence would have run completely or substantially concurrent to that state sentence.
>
> THE DEFENDANT:  I wouldn't have had it first.
>
> THE COURT:  All right?  Mr. Johnson –
>
> THE DEFENDANT:  I won't have it –
>
> THE COURT:  This was explained to Mr. Johnson.
>
> THE DEFENDANT:  You haven't came to me –
>
> (Overlapping speakers.)
>
> THE COURT:  Mr. Johnson, I'm not speaking to you.
>
> THE DEFENDANT:  I don't want to release her, for real.
>
> THE COURT:  The next outburst is another six months. (The defendant and counsel spoke off the record.)
>
> THE COURT:  I don't care how many I give you. Okay?
>
> THE DEFENDANT:  Me neither.
>
> THE COURT:  I told Mr. Johnson that if he was convicted he should not assume that any sentence I gave would be concurrent, and I explained these mandatory minimums that he was facing.
>
> THE DEFENDANT:  Yes, ma'am.
>
> THE COURT:  So the record is very clear that Mr. Johnson had an opportunity –
>
> THE DEFENDANT:  (Overlapping speakers.)

THE COURT:  All right, that's another six months.

THE DEFENDANT:  (Overlapping speakers.)

THE COURT:  All right?  That's a second six months.

THE DEFENDANT:  (Unintelligible.)

VOICE FROM GALLERY:  David, shut up.

THE COURT:  Do you want to keep going?  I'll put on as many as you want.

THE DEFENDANT:  I hear you.  I hear you.

THE COURT:  The record is very clear that Mr. Johnson had a choice.  He exercised his rights to go to trial, and that was fine, and he did, but he did it with his eyes open.  And in any event, and for that matter, Miss Serrat, suppose he had gone first.  All right?  The trial, he would have been convicted had he gone first.

THE DEFENDANT:  I had a hung jury at first.

THE COURT:  All right.  You did have a hung jury, and you were tried again and convicted.

THE DEFENDANT:  140 minutes later.

THE COURT:  He was convicted, so he would have his sentence -- (Overlapping speakers.) (The defendant and counsel spoke off the record.)

THE DEFENDANT:  I'm a mental patient.  I really want to release you.  Can I do that?

VOICE FROM GALLERY:  No, you can't.  Shut up.

THE DEFENDANT:  I hear you.

Sentencing Hr'g Tr., R. 158, PageID # 2928–30.

The rest of the hearing proceeded without incident.  In total, the district court initially issued three six month contempt sentences against Defendant for interrupting the hearing.  However, at the close of the hearing, the district court instead imposed two six month contempt

findings. In a subsequent written contempt order, the court further decreased the contempt finding to a single six month term of custody to run consecutive to the Defendant's 446 month sentence.

Defendant's appeal then followed.

## II. DISCUSSION

### A. Standard of Review

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Churn*, 800 F.3d 768, 774–75 (6th Cir. 2015). "If evidence was erroneously admitted, we ask whether the admission was harmless error or requires reversal of a conviction." *Id.* at 775. We also review a district court's exercise of its summary contempt power for abuse of discretion. *United States v. Kimble*, 305 F.3d 480, 485 (6th Cir. 2002). A district court abuses its discretion if we are left with a "definite and firm conviction that the trial court committed a clear error of judgment." *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989).

We review constitutional challenges to sentences *de novo*. *United States v. Layne*, 324 F.3d 464, 471 (6th Cir. 2003). Constitutional challenges raised for the first time on appeal are reviewed for plain error. *United States v. Hochschild*, 442 F.3d 974, 977 (6th Cir. 2006). To establish plain error, a defendant must show "(1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998).

### B. Analysis

#### 1. Agent Kunkle's PowerPoint Presentation Admitted as Summary Evidence

Defendant claims that the district court committed reversible error by admitting the excerpted slides of Agent Kunkle's PowerPoint presentation as summary evidence under FRE

1006. The government contends that the excerpted presentation was properly admitted under FRE 1006 or, in the alternative, as a secondary-evidence summary.

Federal Rule of Evidence 1006 permits a district court to admit as evidence "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006 (effective until Nov. 30, 2024); s*ee United States v. Bray*, 139 F.3d 1104, 1112 (6th Cir. 1998). Such evidence is subject to several conditions. *Bray*, 139 F.3d at 1109–11 (detailing five necessary conditions for summary evidence to be admitted under FRE 1006).

Our precedents in *Bray* and *United States v. Kerley*, 784 F.3d 327, 341 (6th Cir. 2015), however, permit the admission of secondary-evidence summaries into evidence without the need to invoke Rule 1006. Such summaries "are not prepared entirely in compliance with Rule 1006 and yet are more than mere pedagogical devices designed to simplify and clarify other evidence in the case." *Bray*, 139 F.3d at 1112. Unlike summaries admitted under Rule 1006, secondary-evidence summaries are always admitted in addition to the evidence they summarize "because in the judgment of the trial court such summaries so accurately and reliably summarize complex or difficult evidence that is received in the case as to materially assist the jurors in better understanding the evidence." *Id.* We noted in *Bray* that this type of evidence is admitted in "*unusual* instance[s]" and should be accompanied with a jury instruction "that the summary is not independent evidence of its subject matter, and is only as valid and reliable as the underlying evidence it summarizes." *Id.*

Against this backdrop, Agent Kunkle's excerpted presentation was properly admitted as a secondary-evidence summary. To be sure, the presentation contains some pedagogical information that is outside the scope of the underlying telephone and Google account records:

(1) the location and labeling of the robberies; (2) the location and labeling of a transaction by a credit card that was stolen in a prior robbery on slide 12; (3) an arrow detailing the chronological direction of telephone record data in relation to a map on slide 13; and (4) the Google Maps backdrop against which all of the visualized location data was superimposed. Secondary-evidence summaries, however, may be somewhat pedagogical in nature inasmuch as the district court still determines that the summary "so accurately and reliably summarize[s] complex or difficult evidence that is received in the case as to materially assist the jurors in better understanding the evidence." *Bray*, 139 F.3d at 1112. Importantly, in the instant case, Defendant makes no argument that the cell towers' locations, the approximate locations of Defendant's cell phone number at particular times, or the approximate location of Defendant's Google account at particular times— i.e. the core information to be gained from the telephone and Google account records—were inaccurately portrayed in the slides. Nor does Defendant claim that the additional pedagogical information on the slides made the summary inaccurate or unreliable. Instead, Defendant contends that we should construe *Bray*'s discussion of secondary-evidence summaries as dicta. We decline to ignore our precedent: to the extent *Bray*'s introduction of secondary-evidence summaries was dicta, our decision in *Kerley* explicitly adopted *Bray*'s approach. *See Kerley*, 784 F.3d at 341. Because the district court properly found the excerpted presentation to accurately and reliably represent the underlying telephone and Google Account records, which were also admitted as evidence, and the district court sufficiently instructed the jury that the slides were not independent evidence of the records it summarized and that the slides were only as valid and reliable as those records, we find that the court did not abuse its discretion in admitting the presentation as a secondary-evidence summary. Since we hold that Agent Kunkle's excerpted presentation was

properly admitted as a secondary-evidence summary, we need not decide whether it was also properly admitted under FRE 1006.

### 2. The District Court's Summary Criminal Contempt Orders

Courts have inherent authority to punish for contempt. *Ex parte Terry*, 128 U.S. 289, 302–03 (1888). Criminal contempt is defined by statute as "[m]isbehavior of any person in [the court's] presence or so near thereto as to obstruct the administration of justice;" "[m]isbehavior of any of [the court's] officers in their official transactions;" or "[d]isobedience or resistance to [the court's] lawful writ, process, order, rule, decree, or command." 18 U.S.C § 401.

There is an "unwisdom of vesting the judiciary with completely untrammeled power to punish contempt." *Bloom v. Illinois*, 391 U.S. 194, 207 (1968). So a court must use one of two procedures set forth under Federal Rule of Criminal Procedure 42 to find someone in criminal contempt. Rule 42(a) enables a district court to punish "[a]ny person who commits criminal contempt . . . after prosecution on notice" and sets forth the process by which a district court may do so. Fed R. Crim. P. 42(a)(1)–(3). Rule 42(b) allows a district court to "summarily punish a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies." Fed. R. Crim. P. 42(b); *see also* 18 U.S.C. § 401. Such a finding must be supported by a contempt order that "recite[s] the facts, [is] signed by the judge, and [is] filed with the clerk." Fed. R. Crim. Proc. 42(b).

In addition to these procedural requirements, we further require the following four substantive requirements to be met to sustain a summary contempt finding: "(1) the conduct must constitute misbehavior under 18 U.S.C. § 401(1); (2) the misbehavior must amount to an obstruction of the administration of justice; (3) the conduct must occur in the court's presence; and (4) there must be a form of intent to obstruct." *In re Chandler*, 906 F.2d 248, 249 (6th Cir. 1990).

Against this backdrop, only three written contempt orders cumulating in 24 total months of imprisonment are before this Court on appeal. Those three orders were entered on August 29, 2022, April 11, 2023, and October 2, 2024 for one six month term, two six month terms, and one six month term of custody respectively.

### a. *The Timeliness of Defendant's Appeal*

The government first raises a threshold inquiry to Defendant's appeal. According to the government, a criminal contempt order is final and appealable under our precedents and is subject to a 14-day time limit for criminal case appeals the moment the contempt order is entered onto the district court docket. *See* Fed. R. App. P. 4(b)(1)(A)(i). Thus, the government argues that Defendant's October 10, 2024 notice of appeal was untimely as to the district court's August 29, 2022 and April 11, 2023 contempt orders.

The government appears to be correct. Rule 4(b)(1)(A)(i) mandates that "a defendant's notice of appeal must be filed in the district court within 14 days after . . . the entry of either the judgment or the order being appealed." Fed. R. App. P. 4(b)(1)(A)(i). This rule is a claims-processing rule, which may be waived by the government but must be enforced where, as in the instant case, the government raises the issue of timeliness. *See United States v. Payton*, 979 F.3d 388, 390 (6th Cir. 2020). We have previously held that "[a]n order adjudging one guilty of criminal contempt is final and appealable." *In re Mfrs. Trading Corp.*, 194 F.2d 948, 955 (6th Cir. 1952). It therefore stands to reason that Defendant only had fourteen days after August 29, 2022 and April 23, 2023 to appeal those written criminal contempt orders.

Defendant disagrees, arguing that the "or" in Rule 4(b)(1)(A)(i)'s "entry of either the judgment or the order being appealed" means that the statutory 14-day timeline to file a notice of appeal for any final order is renewed when the underlying judgment is entered on the district

court's docket. This is a rather novel claim, particularly in light of our precedent's acknowledgement that criminal contempt orders are final and therefore immediately appealable. *See In re Mrfs. Trading Corp.*, 194 F.2d at 955. The logical conclusion, as Defendant admits, is that he should have two opportunities to appeal his final criminal contempt orders.

Defendant's interpretation is incorrect. Rule 4(b)(1)(A)(i) uses the definite article "the" when referring to "the judgment or the order being appealed." Fed. R. App. P. 4(b)(1)(A)(i). Use of the definite article implies particularity. *See Slack Techs., LLC v. Pirani*, 598 U.S. 759, 767 (2023). Thus, a defendant's notice of appeal must identify the specific judgment or order he or she intends to appeal. Defendant's notice of appeal refers to, among others, the judgment of Defendant's underlying convictions and the three criminal contempt orders. But the judgment and the orders are distinct. Indeed, the judgment of the underlying convictions makes no reference to the prior criminal contempt orders. This is one indication that this final judgment was not the "judgment" for the contempt orders.

Instead, the contempt orders themselves were judgments. "As a matter of custom and usage, . . . a judgment in a criminal case 'includes both the adjudication of guilt and the sentence.'" *King v. Morgan*, 807 F.3d 154, 157–58 (6th Cir. 2015) (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993)); *see also Massengale v. United States*, 278 F.2d 344, 345 (6th Cir. 1960) ("Final judgment in a criminal case means sentence."). Each contempt order found Defendant guilty of contempt and imposed a specific term of incarceration. Thus, they were final judgments, and Defendant had 14 days to appeal them from their entry on the district court's docket. *See* Fed. R. App. P. 4(b)(1)(A)(i). Accordingly, Defendant's appeals of the district court's August 29, 2022 and April 23, 2023 criminal contempt orders are untimely. Because the government has properly invoked the claims-processing rule, we dismiss these appeals.

**b.** ***Defendant's Challenges to the District Court's Criminal Contempt Orders***

Defendant raises three challenges to the district court's remaining criminal contempt order. None are availing.

First, Defendant contends that the district court erred in holding him in summary contempt through Rule 42(b)'s procedures as opposed to through Rule 42(a)'s notice and trial process for contempt. According to Defendant, a court must first find that an "immediate response" is needed to invoke Rule 42(b)'s summary contempt procedures as opposed to Rule 42(a)'s notice and trial procedures. Defendant claims that such an "immediate response" only exists for disruptions occurring during an ongoing trial. For support for this proposition, Defendant cites to the Supreme Court's decisions in *Harris v. United* States, 382 U.S. 162 (1965) and *United States v. Wilson*, 421 U.S. 309 (1975).

Defendant is mistaken: *Harris* and *Wilson* did not create such a bright-line rule. *Harris* involved a witness who was found summarily in contempt for refusing to testify during a grand jury proceeding and again before the district court after being granted immunity. 382 U.S. at 163. The *Harris* Court disapproved of the district court's use of its summary contempt powers because the witness' refusal to testify "was [not] such an open, serious threat to orderly procedure that instant and summary punishment, as distinguished from due and deliberate procedures, was necessary." *Id.* at 165 (citation omitted). The witness' actions did not affront "the dignity of the court," present a disturbance, or involve "insolent tactics." *Id.* The *Wilson* Court, however, did extol the need for trials to proceed as scheduled, as opposed to the grand jury proceedings in *Harris*. 421 U.S. at 318–19. Nonetheless, the Supreme Court still did not make the notice and trial procedure found in the current Rule 42(a) mandatory for disturbances occurring in non-trial

proceedings. *Id.* at 319 ("Where time is not of the essence, however, the provisions of [the old] Rule 42(b) may be more appropriate to deal with contemptuous conduct.").

While the type of proceeding is not dispositive, certain prudential considerations guide our review as to whether the district court abused its discretion when it invoked its summary contempt powers at Defendant's sentencing hearing. First, we should be mindful of "the principle that only 'the least possible power adequate to the end proposed' should be used in contempt cases." *Id.* (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821)). Second, Due Process normally accords one charged with contempt "notice and a fair hearing." *In re Oliver*, 333 U.S. 257, 276 (1948). Summary contempt is a "narrow exception" to this expectation and "includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent demoralization of the court's authority before the public." *Id.* at 275 (citation modified). Third, as previously discussed, "[w]here time is not of the essence," Rule 42(a)'s notice and trial procedures may be more appropriate. *Wilson*, 421 U.S. at 319. *But see Sacher v. United States*, 343 U.S. 1, 11 (1952) ("[I]f [the trial court] believes the exigencies of trial require that [it] defer judgment until [the trial's] completion [it] may do so without extinguishing [its summary contempt] power."). Finally, when confronted with disruptive defendants, "trial judges . . . must be given sufficient discretion to meet the circumstances of each case." *United States v. Donaldson*, 110 F. App'x 603, 609 (6th Cir. 2004) (quoting *Illinois v. Allen*, 397 U.S. 337, 343 (1970)).

Defendant's repeated outbursts at his sentencing hearing and the disruption that followed justify the district court's use of its summary contempt power. Defendant repeatedly interrupted his attorney, the government's attorney, and the district court throughout the hearing. The bulk of

Defendant's interruptions came after the district court warned Defendant that it would sentence him to six-months' custody for contempt if he disrupted the proceedings any further. The interruptions even spurred someone from the public gallery to twice tell Defendant to "shut up." Sentencing Hr'g Tr., R. 158, PageID #2930. The record makes clear that Defendant's unsolicited and repeated interruptions were egregious, entirely occurred before the district court, undercut the authority of the district court in the eyes of the public, and demonstrated Defendant's intent to obstruct the sentencing hearing. *See In re Chandler*, 906 F.2d at 249. Thus, we cannot say that the district court abused its discretion when it summarily found Defendant in criminal contempt and sentenced him to a single six-month term of custody.

Defendant next claims that the district court erred in cumulatively sentencing him to more than six-months imprisonment for contempt without a jury trial. The thrust of Defendant's argument has been neutered, however, since we only have authority to consider the district court's October 2, 2024 six-month term of custody. Defendant's Sixth Amendment right to a jury trial only applies to sentences exceeding six months for criminal contempt. *See Cheff v. Schnackenberg*, 384 U.S. 373, 380 (1966) ("[S]entences exceeding six months for criminal contempt may not be imposed by federal courts absent a jury trial or waiver thereof."); *see also Bloom*, 391 U.S. at 210–11. Accordingly, the district court did not err when it summarily sentenced Defendant to six months' custody for criminal contempt.

Regardless of the claims-processing rule, Defendant's argument would still have no purchase. As Defendant recognizes in his briefing, Supreme Court precedent allows for multiple summary criminal contempt sentences to cumulatively exceed the six-month limit so long as "each contempt [is] dealt with as a discrete and separate matter at a different point during the [proceeding]." *Codispoti v. Pennsylvania*, 418 U.S. 506, 515 (1974). Defendant claims that the

district court's memorialization and entry of the contempt orders, which reduced the sentences to six month per offense, demonstrates that *Codispoti*'s rule does not apply. This argument is not persuasive. The district court was required to memorialize its findings pursuant to Rule 42(b) and did so immediately after each hearing. The district court did not delay in entering the contempt orders, so we decline to conclude that "there [was] no overriding necessity for instant action to preserve order and no justification for dispensing with the ordinary rudiments of due process." *Id.* at 515.

Finally, Defendant avers that his contempt sentences were procedurally unreasonable because the district court did not consider the 18 U.S.C. § 3553(a) factors when it summarily found Defendant in criminal contempt. But Defendant did not raise this argument in the court below. So, plain error review applies. *See United States v. Sears*, 32 F.4th 569, 573 (6th Cir. 2022) "The sentencing guidelines do not apply to contempt convictions carrying sentences of six months or less." *United States v. Martin*, 251 F. App'x 979, 983 (6th Cir. 2007) (citing U.S.S.G. § 1B1.9 & cmt. n.1). The district court did not plainly err by failing to consider the § 3553(a) factors.

Accordingly, we affirm the district court's October 2, 2024 six-month criminal contempt sentence and dismiss Defendant's appeals of his August 29, 2022 and April 11, 2023 contempt convictions.

**3. The Constitutionality of 18 U.S.C. § 924(c)(1)(D)(ii)'s Mandate That Defendant's Sentences Under This Statute Must Run Consecutive to Defendant's Existing State Sentence**

Title 18 U.S.C. § 924(c)(1)(D)(ii) mandates that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person." "[A]ny other term of imprisonment" includes sentences imposed in state court. *United States v. Gonzales*, 520 U.S. 1, 11 (1997).

Defendant raises two constitutional as-applied challenges to his convictions under § 924(c)(1)(D)(ii). Defendant argues that § 924(c)(1)(D)(ii) arbitrarily treats him differently than individuals who are sentenced in federal court before a state sentence has been imposed on them, thereby violating the Due Process and Equal Protection Clauses of the Fifth Amendment. Defendant failed to raise this argument before the district court so plain error review applies. *See Hochschild*, 442 F.3d at 977. Defendant also contends that § 924(c)(1)(D)(ii) mandates an arbitrary punishment in violation of the Eighth Amendment's prohibition on cruel and unusual punishments by requiring the district court to run his § 924(c)(1)(D)(ii) convictions consecutive to his state sentence. Neither argument has merit.

### a. *Fifth Amendment Equal Protection/Due Process Clause*

"[A] person who *has* been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, . . . so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment." *Chapman v. United States*, 500 U.S. 453, 465 (1991). "[A]n argument based on equal protection essentially duplicates an argument based on due process." *Id.* "In the absence of a suspect classification based on race or other forbidden grounds, a legislative distinction . . . requires only a rational basis to survive a challenge that the classification violates the substantive component of the Due Process Clause of the Fifth Amendment." *United States v. Dunham*, 295 F.3d 605, 610–11 (6th Cir. 2002). "The rational basis justifying a statute against an equal protection claim need not be stated in the statute or in its legislative history; it is sufficient that a court can conceive of a reasonable justification for the statutory distinction." *Id.* at 611 (quoting *Est. of Kunze v. Comm'r of Internal Revenue*, 233 F.3d 948, 954 (7th Cir. 2000)).

Title 18 U.S.C. § 924(c)(1)(D)(ii)'s mandate passes rational basis review.  We agree with our sister circuits that "[d]iscouraging and preventing the use of firearms in the commission of crimes of violence constitutes a legitimate state purpose." *United States v. Khan*, 461 F.3d 477, 495 (4th Cir. 2006); *c.f. United States v. Thomas*, 77 F.3d 989, 992 (7th Cir. 1996) ("Congress could rationally have decided that the use or carrying of a firearm during or in relation to a crime of violence warranted a minimum term of imprisonment in addition to any other term of imprisonment imposed on the defendant.").  The mandate's threat of a sentence under the statute that will always be served consecutive to any existing state or federal sentence offers additional deterrence to others from engaging in behavior in violation of § 924(c).  Thus, we find that the mandate is rationally related to a legitimate state purpose.

Defendant seems to argue that the statute is irrational *as applied to him*, because it was mere happenstance that his state trial, and conviction, preceded the federal.  But "a classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993) (citation modified).  It was rational for Congress to treat the date of conviction as the trigger for imposing an increased sentence, without inquiring whether, under the circumstances of each trial, a different order of proceedings would have been possible.  *Cf. Williams v. Meyer*, 254 F. App'x 459, 463 (6th Cir. 2007) (deeming "rational" a state's distinction between those "who have been convicted and those who have not").  We therefore decline to find that the district court violated Defendant's Fifth Amendment Due Process or Equal Protection rights, let alone committed plain error, when it ran Defendant's § 924(c) sentences consecutive to his state sentence.

**b.** *Eighth Amendment "Cruel and Unusual Punishment" Clause*

The Eighth Amendment proscribes "cruel and unusual punishments." U.S. Const. amend. VIII. Defendant does not argue that his sentence violates the Eighth Amendment because it was grossly disproportionate to the crimes for which he was convicted. Such an argument would fail since our precedents have never found § 924(c)(1)(D)(ii)'s consecutive sentence mandate to be unconstitutional for imposing a "grossly disproportionate" penalty. *See United States v. Watkins*, 509 F.3d 277, 282 (6th Cir. 2007); *United States v. McDonel*, 362 F. App'x 523, 530 (6th Cir. 2010). Rather, Defendant argues that § 924(c)(1)(D)(ii)'s mandate violates the Eighth Amendment because its dissimilar treatment of those sentenced before and those sentenced after a state sentence was levied against them is an arbitrary distinction "so totally without penological justification that it results in the gratuitous infliction of suffering." *See Gregg v. Georgia*, 428 U.S. 153, 183 (1976).[1] This argument is typically raised in challenges to conditions of confinement or a prisoner's treatment while confined. *See Rhodes v. Chapman*, 452 U.S. 337, 345–47 (1981). Defendant, however, novelly extends this argument to the sentencing context.

Defendant's novel argument stands on infirm grounds. He cites to no authority which establishes his proposed Eighth Amendment challenge to his § 924(c) sentences. Even if we credited the existence of Defendant's argument, we could not find that § 924(c)(1)(D)(ii)'s mandate was so "without penological justification" that it violates the Eighth Amendment. *Gregg*, 428 U.S. at 183. As our discussion above on Defendant's Fifth Amendment Due Process argument demonstrates, the mandate is not arbitrary because the threat of a mandatory consecutive sentence

---

[1] Defendant cites to *Quintanilla v. Bryson*, 730 F. App'x 738, 747 (11th Cir. 2018) for the proposition that the Eighth Amendment prohibits arbitrary punishment in the sentencing context. However, *Quintanilla* itself involved a plaintiff-prisoner's challenges to his conditions of confinement and how certain components of his confinement were arbitrary and without penological justification. *Id.* *Quintanilla* cites to *Gregg* for the proposition that the plaintiff-prisoner's "[a]rbitrary placement in the conditions described . . . surely constitutes 'the gratuitous infliction of suffering' in violation of the Eighth Amendment." *Id.* (quoting *Gregg*, 428 U.S. at 183).

more strongly deters individuals from using firearms in the commission of crimes of violence, and it was rational for Congress to treat the date of conviction as the trigger for imposing an increased sentence. Accordingly, we decline to find that the mandatory running of Defendant's § 924(c) sentences consecutive to his state law sentence violated his Eighth Amendment right against cruel and unusual punishments.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's judgment and October 2, 2024 contempt order. We dismiss Defendant's appeals of the district court's August 29, 2022 and April 11, 2023 contempt orders.